**BROTHERHOOD OF RAILWAY AND STEAMSHIP CLERKS, FREIGHT HANDLERS, EXPRESS AND STATION EMPLOYEES, Plaintiff,**

v.

**ATLANTIC COAST LINE RAILROAD COMPANY, Defendant.**

**Civ. No. 876.**

United States District Court
E. D. North Carolina,
Raleigh Division.

July 29, 1957.

William G. Mahoney, Washington, D. C., J. Ruffin Bailey, Raleigh, N. C., for plaintiff.

M. V. Barnhill, Jr., Wilmington, N. C., for defendant.

GILLIAM, District Judge.

The Brotherhood of Railway and Steamship Clerks, Freight Handlers, Express and Station Employees, petitions the Court for enforcement of an order entered by the Third Division of the National Railroad Adjustment Board. The order directed the Atlantic Coast Line Railroad Company to restore one B. B. Phillips to service with compensation for lost wages and with contract rights unimpaired. May 1, 1953 was the deadline set for compliance. The Company refused to comply, and this action has been brought under the provisions of the Railway Labor Act, Tit. 45 U.S.C.A.

§ 153(p) within the two year limitation period prescribed in Sec. 153(q). Phillips personally authorized the Brotherhood to represent his interest before the Adjustment Board and before the courts.

■ Court review of the awards made by the Adjustment Board is limited to the extent that "on the trial of such suit the findings and order of the division of the Adjustment Board shall be prima facie evidence of the facts therein stated * * *." Title 45 U.S.C.A. § 153(p). Before the Adjustment Board and before the Court, the Brotherhood and the Company have been in substantial agreement on the facts that gave rise to the controversy. Both now move for summary judgment since, as each alleges, "there is no genuine issue as to any material fact", though judgment for the plaintiff would be partial, the amount of compensation remaining to be determined. Rule 56, F.R.Civ.P., Tit. 28 U.S.C.A.

The Third Division of the Adjustment Board was deadlocked at the initial hearing. A Referee was added to the ten-member Board. The following opinion rendered by the majority sufficiently states the case:

"This is a discipline case. It appears from the record the Claimant, B. B. Phillips, for the past seven years has been employed by the Carrier in its General Offices as a Clerk in the Office of the Auditor of Freight Receipts, Wilmington, North Carolina.

"By letter dated October 18, 1951, Claimant was notified to appear for investigation Tuesday, October 23, at 10:00 A. M., to answer to the following charges: 'Entering A.C.L. General Office Building "A" after office hours on October 3, 1951, accompanied by outsiders for purposes not connected with your employment with this Company.'

"The Claimant appeared with his representatives at the appointed hour. Some difficulty arose with respect to the taking of evidence at the hearing which is not material to a determination of this claim. As a consequence the hearing was continued to 4:00 o'clock the same afternoon, and proceeded at that hour. Before the investigation the Claimant was informed of the charge against him.

"Upon completion of the investigation the Claimant was dismissed from service to become effective at the close of business on October 31, 1951.

"The contention of the Employees briefly summarized is as follows:

"1. That the charge is not sustained by the evidence.

"2. That the Carrier acted in an arbitrary manner and abused its sound discretion in dismissing Claimant from service.

"3. No rule of the current Agreement has been violated by Claimant.

"The claim is a request to this Board to order Mr. Phillips' reinstatement to service with seniority rights, pass privileges, and all other rights restored, and that he be paid for all time lost at the rate of the position he held at the time of his dismissal.

"The record shows the Carrier properly complied with the procedural requirements leading up to the hearing.

"The evidence is not in substantial dispute. We set forth such part thereof deemed necessary in arriving at a decision in this case.

"It appears, for at least thirty years, the building in question has remained unlocked at least until midnight, or after. During this time it is not unusual for employees to return to their desks after regular working hours during the week, or on Saturdays, Sundays, and holidays, sometimes to complete unfinished work, but in most cases to study records, review correspondence, or otherwise equip themselves for greater responsibility leading to

promotion. The Carrier states it has never restricted the activities of its employees when they occupy the building for such purposes. The building was usually locked up at midnight after the cleaning was finished, and reopened in the morning at the appropriate hour for business.

"On September 28, 1951, Claimant addressed a communication to his superior, as follows: 'If agreeable to you I will be absent from office from 8:30 A.M. 10/2/51, until released by the court account under subpoena of the court.'

"The record shows that Charlie Hart, the janitor and nightwatchman of the building, was on duty the night of October 3, 1951. He was in the basement of the building at about 8:30 P.M. The Claimant had entered the building and was on the first floor. He called to Hart two or three times to come up. Hart responded to the call, and the Claimant introduced him to Mr. Knight, professional photographer, and another gentleman who was with Knight. They informed Hart they wanted to take some pictures of a spiral staircase in the building. They proceeded to the spiral staircase. The Claimant wanted Hart to unlock the door. It was unlocked and then pulled open. They went to the top of the third floor. Arrangements were made for taking the pictures. Hart stayed about 15 minutes until the pictures were taken. He testified that four or five pictures were taken. Phillips left the building with the two men.

"The Claimant testified in substance: 'I asked Mr. Hart who was in charge of the building, for permission to go up there. I called him from the basement and introduced him to the people that were going to take the pictures. He accompanied me up there to see if the door was open. I thought that was all the authority I needed. He was the man here at the time.' Phillips agreed with Hart's testimony as heretofore summarized.

"Phillips testified further that he told Hart what they wanted to do, and after they went up to the third floor, he testified: 'I did not take the pictures. I accompanied the person that did take them, but I didn't even hold the camera or any facility with it.'

"Mr. Wilson, Auditor of Freight Receipts, stated at the investigation: 'The offense with which Mr. Phillips is charged is not recognized in the Revised Agreement between the parties effective July 16, 1951. However, his action on that occasion is regarded as an unwarranted trespass on property of the Company.'

"On a few occasions during office hours the Company, as a courtesy, permitted employees, their friends, and others, to view parades or other spectacles from the windows of the building.

"The objection is not Phillips' presence in the building at that time, but was to the fact that he was accompanied by outsiders not connected with his employment.

"It appears from the record that the Claimant is District Chairman of the Organization representing the employees in the General Office. An employee of the Company was involved in a damage suit with the Company, and the pictures taken of the circular staircase might be used as evidence in the case. The history of this litigation is very vague in the record, and likewise the use made of the pictures if admitted in evidence, and there is no showing that they were so admitted. We find nothing prejudicial to the Company's substantial rights in this respect.

"We deem it of little importance in the state of the record before us

to discuss the taking of the pictures to be used as evidence. In many jurisdictions it is not uncommon to have pictures taken of certain objects, structures, or scenes without an order of court.

"As to the admissibility of the same in evidence, that is a different matter. In this case we are not informed as to whether or not the pictures were admitted as evidence.

*"The dominant factor in this case is, did the Claimant violate any rule of the current Agreement? It is admitted that he did not. In the absence of such a showing, no other course is left open to this Board then to hold that the Carrier acted in an arbitrary manner in exacting the discipline as it did in the instant case. It is not our function to affirm or disagree with the Claimant's action in this case, and our opinion would therefore, under the circumstances, be of little value.* Citation of authority becomes unnecessary under the circumstances of this case. However, where it is shown the discipline is unwarranted, or the Carrier acted arbitrarily without sufficient evidence or just cause, then the Carrier's exaction of discipline cannot stand. See Awards 4325, 5543, 5787. (Emphasis added.)

"After a careful consideration of the record in this case the Board concludes that the Carrier so acted here. The claim should be sustained.

"We hold that Claimant Phillips be restored to his position with seniority rights unimpaired, and with pay for time lost, if any."

In a brief opinion, which need not be set out in full, dissenting members of the Adjustment Board made the following comments in regard to the emphasized portion of the majority opinion: "Of course the Agreement does not list the various offenses for which the Carrier may impose discipline; they are legion. The Award ignores the 'Cardinal Rule of Conduct.' The Claimant herein was charged with improper conduct detrimental to the interests of his employer."

Application of the "Cardinal Rule of Conduct" to Phillips' action presents the key issue in this case. In its brief, the Brotherhood concedes that, "There are, of course, certain acts which an employee might commit for which he could be disciplined even though no specific agreement or company rule had been violated, but these are acts for the commission of which an employee could reasonably expect to be punished." With this accepted as the correct view, it necessarily follows that the quality of the act must be judged by an objective standard. In other words it must be considered in the light of what the employee should have reasonably expected, rather than by what his mental processes actually were, though, no doubt, his revelation of good intentions would be a mitigating circumstance.

The Brotherhood goes on to assert in its brief that Phillips' conduct does not fall within the standard because it was not conduct "inconsistent with the duties he had contracted to perform." In support of this position, Award No. 15578, National Railroad Adjustment Board, First Division, is cited. This award involved discipline imposed on one apprehended on duty with bookmaking paraphernalia in his possession. The Board noted that, unlike most other carriers, the Pennsylvania Railroad had no operating rules broad enough to cover any conduct involving law violations or general immorality. Therefore the Board concluded that, since no rule violation was shown and gambling was not necessarily inconsistent with performance of the employee's duties, discipline was unjustified.

To my mind, conduct "inconsistent with the duties he had contracted to perform" is merely exemplary of conduct properly censorable under the standard for application of the "Cardinal Rule of Conduct". The determinative distinc-

tion between gambling on the job and Phillips' conduct is that the latter was overt action directed against the known interests of the Company, not merely an act that would reflect indirectly on the employer. Surely Phillips could reasonably expect to be punished for his gross disloyalty. What could he have done that would have been more detrimental to his employer than assisting the employer's adversary in litigation that was in progress by obtaining evidence in a clandestine manner in his capacity as an employee? Such conduct has been condemned even when the evidence is thus sought for use in a labor hearing. N.L.R.B. v. Clearwater Finishing Co., 4 Cir., 1953, 203 F.2d 938. Phillips was in no way engaged in any protected union activity, but was helping a plaintiff press a personal injury claim.

■ The Brotherhood insists that because Phillips' disloyal motive was not spelled out in the charge initially lodged against him but was raised in argument before the Adjustment Board, his motive is irrelevant, or, if relevant, the failure to more fully describe the conduct complained of resulted in denial of a fair hearing. I am unable to agree with this argument. The contract does not contemplate that intercompany complaints be drafted with the particularity of criminal indictments or common-law pleadings. The complaint as heretofore quoted from the opinion of the Board was sufficient to fairly appraise Phillips and his representatives of the conduct for which he would be subject to discipline.

For the reasons stated in this opinion, the defendant, Atlantic Coast Line Railroad Company, shall be granted summary judgment denying enforcement of the award by the Third Division of the National Railroad Adjustment Board granted in Claimant's favor.

Defendant will submit formal judgment to be entered simultaneously herewith.